# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 14, 2015 Session

## STATE OF TENNESSEE v. JEROME SANDERS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-01039     Lee V. Coffee, Judge**

---

**No. W2014-00989-CCA-R3-CD – Filed January 27, 2016**

---

A Shelby County Criminal Court Jury convicted the appellant, Jerome Sanders, of aggravated robbery, a Class B felony, and the trial court sentenced him as a Range II, multiple offender to eighteen years to be served at eighty-five percent.  On appeal, the appellant contends that the the trial court erred by refusing to suppress pretrial identifications of him made by the victim; that the trial court erred by failing to suppress his statement to police; that the trial court improperly questioned the victim, which commented on the evidence and bolstered the victim's credibility; that the trial court should have recused itself because the court's conduct and demeanor created judicial bias; that the trial court admitted evidence in violation of Tennessee Rule of Evidence 404(b); that the trial court erred by admitting the co-defendant's statement into evidence; that the State committed prosecutorial misconduct during closing arguments; and that cumulative error warrants a new trial.  Based upon the oral arguments, the record, and the parties' briefs, we conclude that trial court committed reversible error by potentially allowing the jury to hear improper propensity evidence in violation of Rule 404(b), Tennessee Rules of Evidence.  Therefore, the appellant's conviction is reversed, and the case is remanded for a new trial, at which another judge shall preside.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JAMES CURWOOD WITT, JR., J., joined.

André C. Wharton and Alexander Wharton, Memphis, Tennessee, for the appellant, Jerome Sanders.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen C. Baity, Stacey McEndree, and Danielle McCollum, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

In February 2011, the Shelby County Grand Jury indicted the appellant and Corey Brown for the aggravated robbery of Jarvis Robinson. Brown pled guilty as charged and was sentenced as a Range I, standard offender to eight years in confinement. The appellant proceeded to trial.

Although the appellant does not contest the sufficiency of the evidence, we will summarize the proof presented at trial. Kandace Turley testified that in October 2010, she was dating Brown and lived in the Peppertree apartment complex in Memphis. Brown and the appellant were friends, and Turley knew the appellant as "J-Roc." Sometime in October 2010, Brown went to jail. About one week before his confinement, Brown and Turley were at Turley's apartment. The appellant arrived and had two guns. One was the size of a shotgun, and the other was a black handgun. The appellant went to the back bedroom, where Brown was located. About thirty minutes later, both men came into the living room. The appellant stated that they were going to "go hit a lick," which Turley understood to mean commit a robbery. Brown wrapped a hoodie around his head, and the appellant put a t-shirt over his head. The appellant had the handgun, and Brown had the large gun. Turley said that when the two men left her apartment, "[i]t was getting close to the evening, but it wasn't dark."

On cross-examination, Turley testified that she could not remember what the appellant and Brown were wearing. Turley said that Brown later returned to her apartment and that he was calm and went to sleep. Turley acknowledged that Brown asked her to "get rid of some gray sweats." She threw the clothing away.

Denise Cage testified that one night in October 2010, she was at home watching television and heard someone knock on her door. She "cracked" open the door, and a man said, "Let me in. I've been shot. They after me." The man sounded scared. Cage told him that she could not let him in but that she would call for help. Cage said that she heard a gunshot, that the man "took off running," and that she telephoned the police.

On cross-examination, Cage testified that in October 2010, she lived on Marthagene Drive in the Faronia Square apartment complex. She said that it was dark

outside at the time of the incident and acknowledged that it had been dark for a couple of hours. She also acknowledged that the man did not say anything about a robbery.

Trebor Hall testified that in October 2010, she lived in the Faronia Square apartment complex, near the Peppertree apartments. One night, Hall was sitting in her car in the Faronia Square parking lot and heard a gunshot. She said she saw a young man "coming like from the side of my apartments." He was moving slowly, appeared to be in shock, and was holding his right side. The man collapsed onto a car, and Hall got out of her car and went to help him. She telephoned the police and applied a towel to his wound. Hall said that she asked the man if he knew who shot him and that he told her he "[knew] of them." The man said he also had been robbed. Hall identified Jarvis Robinson in the courtroom as the man with the gunshot wound.

Twenty-four-year-old Jarvis Robinson testified that on October 4, 2010, he was living on Mickey Drive, which was "the next street over" from the Peppertree and Faronia apartments. About 9:00 p.m., the victim was on his way to a friend's house and was "walking down Finley Road, about to go towards the [short]cut in Faronia." The victim saw a man running toward him with a gun. The man told the victim, "'[N*****], give me whatever in your pocket.'" The victim said that the gun was "a black .22" and that the man was wearing a mask that "started from the tip of his nose on down." Streetlights were on, and the victim could see the man's nose, eyes, "dreads," and forehead. The victim told the man that he did not have any money but pulled his identification, keys, and some change out of his pocket. The man snatched the items out of the victim's hand. The victim said that at that point, a second man "jumped in" and told the victim, "'[Motherf*****], give that man the money.'" The second man had a black shotgun. The first man asked the victim, "'You think I'm playing?'" He then cocked his gun and shot the victim's right side.

The victim testified that he started knocking on apartment doors in Faronia Square and that the two men ran toward Peppertree. A woman came to her door, and the victim asked her to call the police. However, the second man fired the shotgun, so the woman shut her door. The victim could see the two men at the Peppertree apartments. The victim flagged down a woman who was in her car, and she telephoned 911 and applied a towel to his wound. The victim spent five or six hours in the hospital and did not need surgery because the bullet "went in and out."

The victim testified that he knew both of the robbers but did not know their names. When he got home from the hospital, he described the robbers to two friends, and his friends gave him the names "J-Roc" and "Corey." The victim then gave those names to Sergeant André Pruitt. On October 8, 2010, Sergeant Pruitt showed the victim "[a]bout" three, six-photograph arrays. The victim selected Brown's photograph from one of the

arrays and identified Brown as the man with the shotgun. The victim did not identify anyone from the other two arrays. Four days later, Sergeant Pruitt showed the victim two or three additional arrays. The victim selected J-Roc's photograph from one of them and identified J-Roc, who was the appellant, as the man who shot him. In December 2010, the victim testified at the appellant's preliminary hearing and identified the appellant as the robber who shot him in the side. Prior to the hearing, Sergeant Pruitt had shown some photograph arrays to the victim. The victim said he could have identified the appellant at the hearing even if he had not seen the arrays.

On cross-examination, the victim testified that the appellant's hair on the night of the crimes looked different than the appellant's hair in the photograph array. At first, the victim testified that neither of the robbers was wearing gray clothing. However, he then stated that the appellant was wearing a blue and gray Dallas Cowboys jacket. Both robbers were wearing ski masks, but the masks did not cover their faces entirely. The victim denied telling the police that one of the robbers was wearing a blue and black coat and had a blue bandana around his mouth. The victim said that he had seen the appellant and Brown many times before October 4, 2010, and that he saw them the afternoon before the shooting. Although he did not know the appellant's and Brown's names on October 4, a friend and a cousin later gave him their names. The victim acknowledged that many people had dreadlocks, including both the appellant and Brown. He said the police never showed him a photograph of Quientel Collins.

Upon being questioned by the trial court, the victim testified that he did not know anyone named Quientel Collins. He said he would not be able to identify Collins in a photograph array.

Officer Pierce Hayden of the Memphis Police Department (MPD) testified that he responded to the shooting and was the first officer to arrive. The victim was "pretty hysterical and scared" and told Officer Hayden that he had been robbed and shot by two men. The victim described the men and said that one of them had a pistol and that the other had a shotgun. The victim stated that he had seen both men several times previously in the Peppertree apartments and that they possibly lived there.

On cross-examination, Officer Hayden acknowledged that the victim said one of the robbers was wearing a blue scarf around his face and a blue jacket. The victim did not say the robbers were wearing shirts around their heads. The victim told Officer Hayden that the men took his identification but did not say that they took his keys or money.

Officer Eric Hutchison of the MPD testified that he was dispatched to the crime scene. He photographed a .22-caliber bullet casing partially hidden by leaves and

collected the casing. He also photographed a possible blood spot.

Sergeant André Pruitt of the MPD testified that he investigated the case and talked with the victim on the morning of October 5, 2010. He also went to the crime scene and spoke with officers from the area's Raines Station Precinct. Officers from Raines Station gave Sergeant Pruitt the names of two suspects, Corey Brown and Quientel Collins, whom the officers knew from the neighborhood and had a "history of dealing with." On October 8, 2010, Sergeant Pruitt prepared two, six-photograph arrays, one containing Brown's photograph and one containing Collins's photograph. He showed the arrays to the victim, and the victim picked out Brown's photograph but not Collins's photograph. Sergeant Pruitt stated that he did not keep the array containing Collins's photograph because he had been working on robbery cases for only two or three months and "at the time, [he] didn't know [he] would need it."

Sergeant Pruitt testified that the victim told him the second man involved in the robbery was "J-Roc." Sergeant Pruitt spoke with Corey Brown and learned J-Roc was the appellant. Sergeant Pruitt prepared a six-photograph array containing the appellant's photograph and showed it to the victim on October 12, 2010. The victim identified the appellant as the man who shot him. Later that day, Sergeant Pruitt had the appellant arrested and brought to the police department. The appellant waived his rights and admitted to being involved in the crime. Sergeant Brown asked the appellant how the crime took place, and the appellant told him,

> Through the gate. We, I was going to the cut, we asked him to come and he tried to get back through the hole and he pulled the gun on him. We asked him for his money and he said he didn't have any and he gave me his ID and said that's all he got. I had my hand out and he gave me his stuff. The other person said where it at, and he told him to give it up. I heard a shot, two shots.

On cross-examination, Sergeant Pruitt testified that the victim claimed he had been shot while walking home from the gym. The victim did not say anything about walking to a friend's house. The victim described the first robber as five feet, eleven inches tall; weighing 140 pounds; and wearing blue jeans and a blue or black "big" coat. The victim did not say the robber was wearing a Cowboys jacket. The victim said the first robber also was wearing an "open-face" ski mask and a bandana around his mouth. The victim described the second robber as five feet, eleven inches to six feet tall; weighing 160 pounds; and wearing all-black clothing and a ski mask. According to the appellant's "arrest ticket," which Sergeant Pruitt signed, the appellant was six feet, two inches tall and weighed 180 pounds. Sergeant Pruitt did not take the victim's formal statement

about the crimes until October 16, 2010, four days after the appellant's arrest. Sergeant Pruitt acknowledged that the appellant's appearance in the photograph array may have differed from the appellant's appearance on the day of his arrest, explaining that photographs in an array "are old pictures of individuals who had already been arrested."

Sergeant Pruitt testified that he knew the appellant could read because he had the appellant read an Advice of Rights form during the appellant's interview. The appellant complained of being in pain, so Sergeant Pruitt gave him two Aleve Gel Caps and continued the interview. Sergeant Pruitt said he typically did not show a witness a photograph array prior to a preliminary hearing because he did not want to mislead the witness. Sergeant Pruitt never questioned Quientel Collins.

On redirect examination, Sergeant Pruitt testified that the victim never picked out Collins's photograph. The victim did not have any trouble identifying the appellant as one of the robbers.

Lieutenant Myron Fair of the MPD testified that he assisted Sergeant Pruitt with this case and was present when Sergeant Pruitt interviewed the appellant on October 12. Sergeant Pruitt showed a photograph array to the appellant and told him that the victim had identified him. The appellant then told Sergeant Pruitt about his involvement. Sergeant Pruitt typed the appellant's statement, the appellant made a correction to the statement, and the appellant signed the statement. Lieutenant Fair said he was not present when Sergeant Pruitt advised the appellant of his rights. During the interview, the appellant did not appear to be under the influence of an intoxicant or in pain. On cross-examination, Lieutenant Fair testified that he was unaware the appellant had received pain medication.

At the close of the State's proof, the State played an audio-recorded jailhouse telephone call between the appellant and his mother. During the call, the appellant told his mother that he had admitted to a robbery and that he was "going to do my time on it." The appellant's mother asked him, "Why did you admit to it?" The appellant answered, "Because I did it. I did it, that's why."

Sergeant Robert M. Edwards of the MPD testified for the appellant that he spoke with the victim at the hospital after the shooting. The victim described the first suspect as five feet, eleven inches tall; having "dreads on top with a fade"; and wearing a black jacket and a dark-colored ski mask. The victim described the second suspect as five feet, ten inches tall; having "long dreads"; and wearing dark clothing and a ski mask. The victim told Sergeant Edwards that he was familiar with the suspects but did not know their names. Sergeant Edwards's notes did not reflect that the victim said either man was wearing a bandana or a shirt covering his face. On cross-examination, Sergeant Edwards

testified that the victim said he saw the two suspects "'on a regular basis in the Peppertree Apartments.'"

The jury convicted the appellant as charged of aggravated robbery, a Class B felony. After a sentencing hearing, the trial court sentenced him as a Range II, multiple offender to eighteen years to be served at eighty-five percent release eligibility.

## II. Analysis

### A. Pretrial Identifications

The appellant contends that the trial court should have suppressed the victim's pretrial identifications of him because Sergeant Pruitt tainted the identifications by showing the victim the appellant's photograph array prior to the appellant's preliminary hearing and by failing to preserve the photograph array containing suspect Quientel Collins's photograph. The State argues that the trial court properly denied the appellant's motion to suppress. We agree with the State.

Before trial, the appellant filed a motion to suppress any evidence related to the victim's identification of him as one of the robbers. In the motion, the appellant raised various bases for the suppression, including that Sergeant Pruitt had selected his photograph based on information that did not come from the victim, that the appellant's photograph was "grossly distinguishable" from the other photographs in the array, and that the photograph array was shown to the victim more than one week after the robbery.

At a hearing on the motion, Sergeant Pruitt testified for the State that he spoke with the victim on the morning of October 5, 2010. According to Sergeant Pruitt's notes, the victim described one of the robbers as "'male black, nineteen to twenty-one, five-eleven, one hundred forty pounds. Hairstyle, dreads, with hair cut off on the side, wearing blue jeans, blue/black big coat, ski mask, open-face, and blue bandana around mouth.'" After Sergeant Pruitt developed the appellant as a suspect, he used the "Mugshots database" to prepare a photograph array containing the appellant's photograph. Sergeant Pruitt went over an Advice to Witness Viewing Photographic Display form with the victim, and the victim signed the form. Sergeant Pruitt showed the array, which contained six photographs of "[m]ale blacks with dreads," to the victim. The victim circled the appellant's photograph and identified him as "'the guy that shot me with a .22.'"

On cross-examination, Sergeant Priutt testified that after the robbery, he spoke with officers from the Raines Station Task Force and gave them the descriptions of the suspects. The officers then "started giving [Sergeant Pruitt] some names," including the

names of Corey Brown and Quientel Collins.  On October 8, Sergeant Pruitt prepared two photograph arrays that included Brown's and Collins's photographs and showed them to the victim.  The victim identified Brown as one of the robbers but not Collins.

At that point, defense counsel requested to see the array containing Collins's photograph, and the State responded, "Well, keep going.  I'm looking."  Sergeant Pruitt acknowledged that he prepared a "supplement" and that he did not note the victim's failure to identify Collins in the supplment.  When asked why he failed to do so, he answered, "I don't know why.  Human error."  The State later advised the court and defense counsel that it did not have the array containing Collins's photograph.

The victim testified that "[t]he dude that shot me, his nose and on down was covered."  The second robber was wearing a ski mask, but the victim could see his eyes and nose through "the big old hole."  The victim did not have any problem seeing their faces and recognized them from the Peppertree apartments but did not know their names.  The victim learned the names "J-Roc" and "Corey" from a friend and gave the names to Sergeant Pruitt.  On October 8, Sergeant Pruitt showed the victim two photograph arrays, and the victim picked out Corey Brown's photograph from one of them.  He did not identify anyone from the second array.  Subsequently, Sergeant Pruitt showed the victim a third array containing the appellant's photograph, and the victim identified the appellant as the other robber.  At the appellant's preliminary hearing, the victim also identified the appellant as one of the robbers.

On cross-examination, the victim testified that it was dark at the time of the robbery but acknowledged that street lights were on.  He acknowledged that the photographs in the October 12 array did not have the same backgrounds and that the complexions of some of the individuals appeared lighter than others.  The victim also acknowledged that he talked with Sergeant Pruitt before the appellant's preliminary hearing.  Sergeant Pruitt showed the array containing the appellant's photograph to the victim and asked, "'Do you think you can still remember him?'"  The victim told him yes.  During the hearing, the victim identified the appellant as the man who shot him.

The trial court questioned the victim, asking if he could have identified the appellant at the preliminary hearing without seeing the photospread prior to the hearing.  The victim said yes.

Sergeant Edwards testified that he interviewed the victim at the hospital on October 4, 2010.  The victim said that both of the robbers were wearing ski masks but that he knew who they were because he had seen them on a regular basis in the Peppertree apartments.  The victim described one of the robbers as five feet, eleven inches tall and having a medium build, a dark complexion, and "dreads . . . on top with a

fade." The victim said the robber was wearing a blue and black jacket but did not mention a scarf or Dallas Cowboys jacket. The victim described the second robber as five feet, eleven inches tall; wearing all-black clothing; and having bright skin, a medium build, and "long dreads."

Defense counsel introduced the photograph array containing the appellant's photograph into evidence and argued that, based on the differences in the photographs and the victim's inconsistent descriptions of the robbers, the trial court should suppress the victim's pre-trial identifcations of the appellant. Defense counsel also argued that the trial court should consider Sergeant Pruitt's showing the array to the victim before the appellant's preliminary hearing and "give that some weight." The trial court stated that based upon Neil v. Biggers, 409 U.S. 188 (1972), it had considered the totality of the circumstances concerning the appellant's array. The trial court noted that "there are some differences in the photographic spread" but found the differences to be "miniscule" and ruled that the array was not unduly suggestive. Thus, the court denied the appellant's motion to suppress.

Subsequently, the appellant filed a motion to dismiss the indictment based upon defense counsel's learning during the suppression hearing that Sergeant Pruitt had failed to preserve the photograph array containing Collins's photograph. In the motion, the appellant argued that the officer had a duty to preserve the array, that the jury "will now not be able to appreciate what [the victim] reviewed, perceived or was told at the time all of the photographic spreads were shown to him," and that the array was "very significant" impeachment evidence.

At a hearing on the motion to dismiss the indictment, the State advised the trial court that Sergeant Pruitt did not preserve the original array but saved it in a "Mug Shots database." Therefore, it could be printed and made available to defense counsel. The State noted that defense counsel had cross-examined Sergeant Pruitt and the victim about the array at the suppression hearing. The trial court ruled that the State had a duty to preserve the array but that Sergeant Pruitt's loss of the array was "simple human error." The court found that the signficance of the missing array was "not great" because the victim testified unequivocally that no one in the array was involved in the crime and that, in any event, an exact duplicate of the array was available; therefore, the appellant was not prejudiced by the loss of the evidence.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates

otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

First, the appellant claims that the trial court erred by refusing to suppress the victim's pretrial identifications of him because Sergeant Pruitt tainted the identifications by showing the victim the appellant's photograph array prior to the appellant's preliminary hearing. The State argues that the appellant has waived the issue because he failed to raise it in his motion to suppress, which resulted in the the trial court's failing to address the issue. Although defense counsel did not mention the issue in the motion, counsel questioned Sergeant Pruitt and the victim about the officer's showing the array to the victim before the preliminary hearing. The trial court also questioned the victim about it. Moreover, defense counsel asked the trial court to consider that factor in its determination as to whether the the victim's identification of the appellant in the October 12 photograph array should be suppressed. Therefore, we conclude that the appellant sufficiently preserved the issue for our review.

Nevertheless, we conclude that the appellant is not entitled to relief. The appellant contends that Sergeant Pruitt's showing the victim the photograph array prior to the preliminary hearing tainted all of the victim's pretrial identications of him. However, the evidence at the suppression hearing and at trial established that the victim advised Sergeant Pruitt shortly after the shooting that he recognized the robbers. Although the victim did not know their names, he was able to learn their nicknames from friends and gave those nicknames to the officer. Sergeant Pruitt learned the appellant's real name, prepared a photograph array containing the appellant's photograph, and showed it to the victim on October 12. The victim picked out the appellant's photograph, and we fail to see how Sergeant Pruitt's later showing the victim the array at the preliminary hearing tainted that October 12 identification. Moreover, the trial court specifically asked the victim at the suppression hearing if he could have identified the appellant at the preliminary hearing without seeing the array, and the appellant said yes. The trial court obviously accredited the victim's testimony and concluded that his seeing the array prior to the hearing did not taint his pretrial idenifications of the appellant. Therefore, we conclude that the trial court did not err by denying the appellant's motion to suppress.

Next, the appellant contends that the trial court should have suppressed the victim's pretrial identifications of him pursuant to State v. Ferguson, 2 S.W.3d 912

(Tenn. 1999), because Sergeant Pruitt failed to preserve the photograph array containing Collins's photograph. The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In Ferguson, our supreme court addressed the issue of when a defendant is entitled to relief in the event the State has lost or destroyed evidence that was alleged to have been exculpatory. 2 S.W.3d at 915-18. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. However,

> "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)).

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
>
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider

several options such as dismissing the charges or providing an appropriate jury instruction. Id. Generally, a trial court's decision to admit or exclude evidence at trial will not be overturned absent an abuse of discretion. State v. James, 81 S.W.3d 751, 760 (Tenn. 2002). An abuse of discretion exists when the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Turning to the instant case, the trial court addressed all of the Ferguson factors. The court found that the State had a duty to preserve the array but that Sergeant Pruitt's loss of the array was "simple human error." We note that Sergeant Pruitt did not explain what happened to the array during the motion to dismiss the indictment. At trial, though, he stated that that he did not keep the array because he had been investigating robbery cases for only two or three months and did not think he needed to keep it. Nothing indicates that Sergeant Pruitt destroyed the evidence maliciously or intending to disadvantage the appellant. Therefore, Sergeant Pruitt's intentional disposal of the array was simple negligence.

As to the significance of the evidence, the appellant characterizes the array containing Collins's photograph and the array's accompanying witness advice form as "critical pieces" of evidence and that the failure to preserve the evidence prevented him from cross-examining witnesses about the similarities between the six photographs or the consistency of the photographs with the victim's description of the suspects. He also contends in his responsive brief that he could have used the array to impeach Sergeant Pruitt's testimony because the victim testified that Sergeant Pruitt never showed the array to him.

Regarding the appellant's latter claim that the array had impeachment value because the victim testified that Sergeant Pruitt never showed the array to him, we believe the appellant has misrepresented the evidence. The victim testified at the suppression hearing and at trial that Sergeant Pruitt showed him photograph arrays on October 8 and that he identified only one of the robbers, Brown. His testimony was entirely consistent with Sergeant Pruitt's testimony at the suppression hearing and at trial that Sergeant Pruitt showed the array containing Collins's photograph to the victim on October 8 and that the victim did not identify anyone. Granted, defense counsel asked the victim at trial if Sergeant Pruitt ever showed him a photograph of Quientel Collins, and the victim said no. However, the victim's answer was a logical response given that the victim said he did not know Collins and could not identify a photograph of him. Therefore, we question the impeachment value of the destroyed evidence. In any event, we agree with the trial court that the significance of the evidence was low in light of the fact that the original array was saved in the Mugshot database and that an exact duplicate

was available to the defense. Finally, the remaining evidence was more than sufficient to convict the appellant. Therefore, we conclude that the appellant's trial without the evidence was not fundamentally unfair and that the trial court properly denied the appellant's motion to suppress the victim's pretrial identifications.

## B. Statement to Police

The appellant contends that the trial court erred by denying his motion to suppress his statement to Sergeant Pruitt. The State argues that the trial court properly denied the motion. We agree with the State.

Before trial, the appellant filed a motion to suppress his October 12, 2010 statement. In the motion, the appellant alleged that his limited intelligence prevented him from knowingly, intelligently, and voluntarily waiving his rights. He also alleged that he was under the influence of an intoxicant and in "excruciating" pain from a recent gunshot wound during his police interview and that the "overall circumstances" of his interrogation supported suppression.

At a hearing on the motion, Sergeant Pruitt testified for the State that the police knew the appellant "was responsible for several robberies." The police arrested the appellant on October 12, 2010, and Sergeant Pruit met with him in the Robbery Bureau at 3:55 p.m. The appellant told Sergeant Pruitt that he had completed the eleventh grade and answered questions on an Advice of Rights form, stating that he could read, was not under the influence of drugs, was not suffering from any mental disorder, and was not in any physical discomfort that would prevent him from participating in an interview. Sergeant Pruitt said that the appellant did not seem to have any problem understanding and that the appellant signed the Advice of Rights form, waiving his rights. The appellant had been shot sometime before his interview and told Sergeant Pruitt that "they didn't give him any medicine at the hospital." The appellant complained of pain, so Sergeant Pruitt gave him two Aleve Liquid Gels. Sergeant Pruitt said that he did not threaten or promise the appellant anything and that the appellant gave a "[v]ery short" statement. The interview ended about 7:00 p.m. The appellant reviewed his statement, made one change to it, and signed the statement.

On cross-examination, Sergeant Pruitt testified that the police arrested the appellant at 12:18 p.m. and that he gave the pain medication to the appellant at 3:55 p.m. He did not begin taking the appellant's statement until 6:00 p.m.

Lieutenant Vivian Murray of the MPD testified for the State that on October 12, 2010, she was investigating a murder case in which the appellant was a suspect. After Sergeant Pruitt interviewed the appellant, Lieutenant Murray interviewed him. The

interview began about 7:15 p.m., and she did not "re-Mirandize" him. She said the appellant had been shot recently but "seemed fine," did not appear to be in pain, and seemed to understand what was happening. The appellant told Lieutnant Murray that he had used drugs "a day or so" before the interview but that the gunshot wound "'blew the high right out of him.'" Lieutnant Murray offered to let the appellant use the restroom or have something to eat before the interview, but he declined. At 9:00 p.m., Lieutnant Murray took a break from the interview and got the appellant something to eat and drink. She said she never threatened him or promised him anything. The appellant told her that he had an eleventh-grade education. The appellant gave a multi-page statement, read and initialed each page, and signed the statement.

On cross-examination, Lieuteant Murray testified that the appellant's interview was not recorded. She said that he did not appear tired but that he was "a little restless . . . as if he didn't want to be there." She stated that the appellant did not seem "slow" and that he appeared to be of normal intelligence for an African-American male his age. She said, "I wouldn't call him a scholar, but I didn't feel that he was unintelligent or could not understand."

Sergeant Robert Wilkie of the MPD testified for the appellant that he assisted Lieutnant Murray with the appellant's homicide interview on October 12. Sergeant Pruitt had advised the appellant of his rights, so Sergeant Wilkie and Lieutnant Murray did not readvise him of his rights. Sergeant Wilkie said he did not know that Sergeant Pruitt had given the appellant Alleve in the Robbery Bureau. He said that the appellant "made no complaints or seemed to be out of sorts" and that the appellant "appeared normal." Sergeant Wilkie also said the appellant "seemed to commiunicate okay, and he appeared to read well and speak well."

On cross-examination, Sergeant Wilkie testified that the appellant did not indicate that he was confused or did not understand what was happening. The appellant never said he was in pain.

Dr. James Walker testified for the appellant that he was a forensic neuropsychologist, which he described as "simply a clinical psychologist who has additional training and experience in dealing with brain dysfunction and brain disease." On August 29, 2012, Dr. Walker met with and evaluated the appellant. Prior to the appellant's evaluation, Dr. Walker had reviewed the appellant's school, medical, mental health, and jail records. Dr. Walker said that at seven years old, the appellant's IQ was thirty-two, which "put [him] in the bottom first percentile." A couple of years later, the appellant's overall score on the adaptive function scale was sixty-three, which indicated that "he's still having very serious trouble in just doing the basic day-to-day tasks that everyone has to do to get by." In 2005, the appellant was administered the Test of

Nonverbal Intelligence in juvenile court and scored eighty-three, which was slightly below average. Dr. Walker stated that the appellant's score "[did not] match with all the other numbers that we see with Jerome over the years" but that the Test of Nonverbal Intelligence was "not a very good test for estimating a person's overall intelligence level." Dr. Walker said that he had no doubt the appellant was of limited intelligence and that his meeting with the appellant "simply confirmed that, both in terms of my observations and my testing of him." Dr. Walker diagnosed the appellant as having mild mental retardation and concluded that he was "marginally" competent for trial.

Dr. Walker testified that he reviewed the appellant's statement to Sergeant Pruitt. Dr. Walker said that the statement took him "about twenty seconds" to read and that he wondered what else happened during the interivew "besides just those simple questions and answers that were there." The appellant told Dr. Walker that the officers had been very coercive and threatening and that he was intoxicated when he gave the statement. Dr. Walker noted that the appellant told the officers he was not intoxicated. Dr. Walker said the appellant had been shot in the arm three days before his interview with Sergeant Pruitt and had been sent home with a prescription for hydrocodone. Although the appellant told Segeant Pruitt that he did not take any medication on the day of his interview, the appellant told Dr. Walker that he had taken four hydrocodone pills. Dr. Walker stated, "You take a man of limited intelligence and you bathe that same brain in alcohol and drugs, it's functioning even less efficiently, so he's even less able to make decisions and to think independently in a reasonable, rational fashion." Dr. Walker stated that "people aren't at their best when they're hungry and tired" and that "certainly, that might have had some bearing on his mental state." Dr. Walker concluded that the appellant was

> a man who's easily led, is very suggestible, and if you put him in a room with people who are smarter and brighter and stronger willed than he is, the reliability of what comes out of that room might be influenced by the people who are questioning him. That's the extent of my opinion in this matter.

On cross-examination, Dr. Walker acknowledged that although the appellant was susceptible to going along with what other people said, the appellant maintained that he was not the shooter in this case. Regarding the appellant's rights, Dr. Walker stated as follows:

> I don't see any information that says that he was not able to intelligently and voluntarily waive his rights. I just don't think that his intelligence and knowingness is that of the

average person. He's a very limited person, who in that context was waiving those rights as best as he could under the circumstances.

Dr. Walker acknowledged that the appellant was "grossly dishonest" with him. Specifically, the appellant was dishonest about when the appellant was shot and whether he was under the influence during his police interviews. Dr. Walker said the appellant malingered, "appeared to be very determined to be deceptive with me," and put forth a poor effort throughout the examination. Dr. Walker said that the appellant "seemed to be wanting to appear to be very impaired with regard to his memory, that he just didn't understand things, that he didn't remember things, he couldn't remember from one moment to the next what he had been told."

On redirect examination, Dr. Walker testified that a lot of people malingered during their evaluations. He said that he factored the appellant's malingering into his opinions and that "it doesn't change any of them."

The trial court ruled that the testimony failed to establish that the appellant was mentally retarded or unable to waive his Miranda rights. The court noted that nothing indicated the appellant was experiencing "excruciating" pain from his gunshot wound at the time of his interviews and that Dr. Walker testified that the appellant was competent and capable of waiving his rights. The court acknowledged that the appellant had a low IQ but stated that the evidence failed to show his IQ was so low that it prevented him from being able to waive his rights knowingly, intelligently, and voluntarily. The court found that the appellant was not deprived of food or medication and that he was "given what he asked for." Thus, the court denied the appellant's motion to suppress his statement.

Generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). As our supreme court has explained,

> In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include

- 16 -

> warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000). Miranda warnings are necessary only in situations involving custodial interrogation or its functional equivalent. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); State v. Dailey, 273 S.W.3d 94, 102-03 (Tenn. 2009).

Our courts look to the totality of the circumstances surrounding the interrogation to determine if the criteria for a proper waiver are met. See State v. Van Tran, 864 S.W.2d 465, 472-73 (Tenn. 1993). In doing so, we consider the following factors regarding the voluntariness of a confession: (1) the appellant's age, education or intelligence level, and previous experience with the police; (2) the repeated and prolonged nature of the interrogation; (3) the length of detention prior to the confession; (4) the lack of any advice as to constitutional rights; (5) the unnecessary delay in bringing the appellant before the magistrate prior to the confession; (6) the appellant's intoxication or ill health at the time the confession was given; (7) deprivation of food, sleep, or medical attention; (8) any physical abuse; and (9) threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). "'[N]o single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and [did] so waive, the constitutional rights embraced in the Miranda rubric.'" Blackstock, 19 S.W.3d at 208 (quoting Fairchild v. Lockhart, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)). Furthermore, this court has stated,

> Coercive police activity is a necessary prerequisite in order to find a confession involuntary. The crucial question is whether the behavior of the state's officials was such as to overbear [Appellant's] will to resist and bring about confessions not freely self-determined. The question must be answered with complete disregard of whether or not the accused was truthful in the statement.

State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (quotation marks and citations omitted).

Here, the appellant was twenty years old when he gave his statement. The appellant dropped out of high school in the eleventh grade but could read. Sergeant Pruitt advised the appellant of his rights, the appellant signed a waiver of rights form, and Dr. Walker concluded that, although the appellant had a low IQ, he was intelligent enough to

understand his rights and waive them. Sergeant Pruitt testified that the appellant never indicated that he did not understand. Lieutenant Murray and Sergeant Wilkie, who interviewed the appellant shortly after Sergeant Pruitt, also testified that the appellant seemed to understand what was happening. According to the appellant's presentence report, he had a lengthy criminal history, including numerous convictions of simple assault. The appellant gave his statement to Sergeant Pruitt just hours after his arrest and told the officer that he was not intoxicated or physically ill. Although the appellant complained of pain from a gunshot wound at the beginning of his interview, Sergeant Pruitt gave him some over-the-counter pain medication, and he did not complain further. The appellant also did not complain of being deprived of sleep or food, and when Sergeant Pruitt offered to let him go to the restroom and get something to eat, he declined. The appellant was not physically abused, and Sergeant Pruitt denied threatening the appellant. In short, the <u>Huddleston</u> factors do not weigh in favor of finding that the appellant's statement was unknowing, unintelligent, or involuntary.

## C. Trial Court's Questioning the Victim

The appellant contends that the trial court commented on the evidence during its questioning of the victim, the State's "key" witness, and bolstered the victim's credibility. The State argues that the court remained neutral in its questioning and limited its questions to clarifying the victim's testimony. The appellant responds that the court went beyond clarifying and repeatedly asked suggestive questions, providing direction for the victim's testimony. We conclude that the appellant is not entitled to relief.

During the victim's redirect testimony, the State began asking questions to clarify how he learned the robbers' names. The following colloquy then occurred:

> **Q.** Tell, the jury, how did that happen? How did you find out the name[s]? Did [people] tell you, or did you tell them?
>
> **A.** I told them.
>
> **Q.** You told them the name[s] or you told them -- I'm confusing myself now.
>
> **[THE STATE]:** Strike that.
>
> **THE COURT:** Mr. Robinson, what [the State] is asking you, you did not know the names of the folks that shot you; is that correct?

**THE WITNESS:** Yes, sir.

**THE COURT:** But you knew the faces?

**THE WITNESS:** Yes, sir.

**THE COURT:** And you had seen -- and I think you told the jury you had seen them over in the Peppertree Apartments; is that correct?

**THE WITNESS:** Yes, sir.

**THE COURT:** Now, when you asked your friends, your friend girl, and you asked the other person --

**THE WITNESS:** Yes, sir.

**THE COURT:** -- did they tell you that those are the person -- people that shot you?

**THE WITNESS:** Yes, sir.

**THE COURT:** Now, did they tell you that, "This is the person that shot you," or did you tell them, "This is the person that shot me, and I'm trying to find out the name of the person"?

**[DEFENSE COUNSEL]:** Your Honor?

**THE COURT:** [Defense counsel], don't intererrupt me when I'm asking questions, please, sir. I'm trying to clarify this so we can move on. This man has been on the witness stand since 11:00 this morning. And this is going to come to an end.

Do you understand the question, sir?

**THE WITNESS:** Yes, sir.

**THE COURT:** Now, when you asked those

- 19 -

questions, did you tell them who had shot you and you were trying to find out the names, or did these people tell you that these are the folks that had shot you?

**THE WITNESS:** The first question you said.

**THE COURT:** Okay. Now, I can't say. You tell me what you did.

**THE WITNESS:** They told me [their] names.

**THE COURT:** Okay. And did -- were you trying to find out the names of the people that shot you or trying to find out the faces of the people that shot you?

**THE WITNESS:** I was trying to find out [their] names.

**THE COURT:** Okay. So when you had these discussions, did somebody suggest to you who had shot you, or did you know who had allegedly shot you?

**THE WITNESS**: I know who had shot me.

**THE COURT:** [State], you may proceed.

**[THE STATE]:** Thank you, judge.

The next day, prior to any testimony, defense counsel asked to address the court, and the following exchange occurred:

**[DEFENSE COUNSEL]:** . . . . Your Honor, you may recall yesterday, during Mr. Robinson's questioning, . . . Your Honor interjected and began to question Mr. Robinson.

**THE COURT:** Yes, sir.

**[DEFENSE COUNSEL]:** And I attempted to address Your Honor. I don't recall the words. The court reporter will have that reflected in the record. But --

- 20 -

**THE COURT**: I think what I exactly said is, [defense counsel], "Please don't interrupt me."

. . . .

**[DEFENSE COUNSEL]:** Yes, sir. "Don't interrupt me." And you turned around, Your Honor, and looked at me and, basically, let me -- you would not let me object to it. I believe the rules . . . allow the Court to question, which you are entitled to under your purview as the Court, but they allow me to either object at that time or at a time shortly thereafter. I think that's what the rules say.

Your Honor, I'm very concerned, not only about how Your Honor -- and I know you -- the Court is human -- but how Your Honor addressed me, but, also, the context, because after you addressed me and said, "[defense counsel], don't interrupt me," in an elevated tone --

. . . .

**THE COURT:** [Defense counsel], if you have a motion to make, please make the motion. Because here we go again. Every time we get ready to start trial, we need to take up ancillary issues that delay the trial again. It is Friday afternoon. I told the jury we would probably be finished by Friday. It's beginning to look like it's not going to be done by Friday. So if you have a motion, please make it, and please make it concisely, and I will certainly let you make any motion that you want.

**[DEFENSE COUNSEL]:** Your Honor, I was trying to articulate the grounds, but if you want me to just rush through it, I will.

**THE COURT:** No, sir. You're asking or saying, "This is what I think you said." The record reflects what I said . . . . So any -- any motions that you want to make, please make it. I'll give you all the time that you need to make the motion.

**[DEFENSE COUNSEL]:** Yes, sir. And I know -- and Your Honor, I sense the Court is getting frustrated with us, but, Your Honor, I would just point out for the record, we're not delaying. Your Honor does have a docket every morning, but you're getting frustrated with us about the time we're starting every day, and you have made comments repeatedly during this case about how long the motions have taken. And it seems like the Court is addressing it towards counsel and the Defense, Your Honor. And I have to, as a zealous advocate for my client, do what I believe to be important for the record. And Your Honor can shut me down at any point. That's fine. You control your Court. But I have to address these things as I see -- as they come forward, Your Honor. If I don't do it, and Your Honor knows this, you've read the law, I'm not doing my job. And so we have that balancing issue, Your Honor.

But, let me make my motion. Your Honor, the point is -- and I wasn't even finished -- the point is --

**THE COURT:** . . . [T]his is what I mean . . . . You spent all this time saying things that are not relevant to the motion, and all these sidebar comments that you're making are not relevant . . . . "The point is, I was not even finished." I'm trying to let you finish. That -- I mean, that comment was not necessary.

Now, sir, please make the motion that you have to make, please, sir.

**[DEFENSE COUNSEL]:** All right, Your Honor. The other aspect of this motion that I make before the court is the comment that Your Honor made regarding how long Mr. Robinson had been on the stand. Your Honor indicated, "This man has been on the stand since 11:00 a.m." And I don't quote you on that directly, but it was something to that effect.

**THE COURT:** That is what I said, yes, sir.

**[DEFENSE COUNSEL]:** And that's problematic,

Your Honor, in context. And the reason is because you're now commenting on the crediblity of a witness at that point. . . . . In the context of -- your comment was that, "This man is maybe tired, he's been on the stand since 11:00 a.m." You're commenting on the credibility of a witness before the witness even said anything about being fatigued or tired. You sit in a special position as the Court, so here's my motion.

I'm asking, first, for a mistrial. If you deny that, alternatively, I'm asking for you to address the jury about this -- the dialogue that you had in front of the jury and maybe give some instruction regarding that. There are already instructions in there, but we believe the naure of the -- the -- how that came across to the jury was improper, and I think the jury needs some instruction if Your Honor is not inclined to grant a mistrial.

The trial court advised defense counsel that the victim had been questioned about the robbers' names "mutiple times"; that the repeated questioning "was causing frustration for the jury"; and that pursuant to Rule 611, Tennessee Rules of Evidence, the court "was simply trying . . . to exercise control over the presentation of the evidence when necessary." The court noted that it interrupted the State's questioning of the victim, not defense counsel, and that it did so "so that we could get this done, get it over with and move on in this trial." The court denied counsel's request for a mistrial, but agreed to give a jury instruction. The trial court then stated as follows:

I don't interrupt lawyers, and I take offense, professional offense, when lawyers interrupt the Court. I do not interrupt lawyers, period, unless I have to, and I interrupted [the State] because I had to. And then to be doing my job and my obligation under the law and, all of a sudden, to have you jump up to tell me that you want to interrupt me, [defense counsel], that's a professional discourtesy, in my opinion.

[I]t is my obligation to treat everyone with courtesy, dignity, respect and civility, and I extend that to everyone. And it is something that the Court would require of lawyers . . . . And when lawyers interrupt judges, there are some judges, [defense counsel], that would have yelled at you, would have screamed at you and would have -- under the [D*****] case,

- 23 -

as [that judge] did to the lawyers in that case, his conduct, the Court may have taken some exception to -- and I don't do that. I don't scream at lawyers, I don't raise my voice[] at lawyers, I don't undress lawyers the way that [some] other judges would have done.

. . . .

But in the [D*****] case, I want to be clear that the [D*****] case is not anything like this case. The [D*****] case, [that judge] started yelling and screaming at lawyers, literally yelling and screaming at lawyers. It was all on TV where he was yelling and screaming at lawyers and telling them to sit down, shut up, don't say anything else, or words to that effect. It was a very hostile environment, and he came back and apologized because, as [that judge] is wont to do, he loses his temper, and he starts yelling and screaming at people, and then he feels apologetic because he realizes he should not have done it.

I would never -- and this is not a criticism of [that judge], but I would never engage in that kind of repartee with jurors or lawyers in front of or outside of the presence of the jury. [That judge] and I have totally different personalitities. And as I said a few minutes ago, had it been Division X or Division VIII or some other courts in this building, he would have undressed -- those judges would have undressed the lawyer, would have yelled, would have screamed, and it becomes very unpleasant. And I try really hard not to do that.[1]

When the jury returned to the courtroom, the court instructed the jurors as follows:

It is the Court's -- as I told you during the preliminary instructions, it is my obligation to make sure that both sides are getting a fair trial in this case, and I do not try to interrupt lawyers unless I think they get to a point where they're asking questions that may have been addressed already. So when I interrupted [the State], it was not anything needed or intended

---

[1] Although the trial court referred to a specific case and specific judges, we have chosen not to identify them by name.

- 24 -

to indicate that the State of Tennessee was doing anything improper. And when I told [defense counsel] not to interrupt the Court, it was not anything to indicate that [defense counsel] was doing anything improper. I just felt simply that Mr. Robinson's testimony needed to be brought to a conclusion and that no other questions needed to be asked about the particular subject that [the State] was still asking questions on.

The appellant contends that that the trial court's questions "reflected the judge's opinion of the case" and "made the witness look as if he was more credible or gave the jury the impression that the Trial Court was protecting him." In support of his argument, the appellant relies on another incident in which the trial court interrupted the State's redirect examination of the victim and questioned him as follows:

[THE STATE]: Okay. And you told the jury earlier that you were shown another photospread where the person that is not there, correct?

A. Yes, ma'am.

Q. Do you know who was in that photospread of the people that the person was not there?

A. No, ma'am.

Q. Could Quientel Collins have been in that photspread?

A. I don't know.

[DEFENSE COUNSEL]: Objection.

THE COURT: [Defense counsel], your question [on cross-examination] was whether or not he had seen a photograph of Quientel Collins.

Mr. Robinson, do you know Quientel Collins?

THE WITNESS: No, sir.

- 25 -

**THE COURT:** If he walked in the Courtroom today, would you know him?

**THE WITNESS:** No, sir.

**THE COURT:** So if somebody showed you a photospread that had a photograph of a Quientel Collins in it, would you be able to recognize him?

**THE WITNESS:** No, sir.

**THE COURT:** [The State] may proceed.

"The propriety, scope, manner and control of examination of witnesses is within the trial court's discretion." State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992). Moreover, Tennessee Rule of Evidence 611(a) provides that "[t]he court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel."

"The trial judge may, in the exercise of discretion and with use of restraint, ask questions of witnesses to clear up confusion in the testimony of a witness." State v. Hardin, 691 S.W.2d 578, 581 (Tenn. Crim. App. 1985). Questions "which tend to . . . expedite the proceeding" also are permitted. State v. Franklin E. Harris, Jr., No. 02C01-9308-CR-00172, 1994 WL 201830, at *3 (Tenn. Crim. App. at Jackson, May 25, 1994) (citing State v. Hunt, 665 S.W.2d 751, 755 (Tenn. Crim. App. 1984)). However, our supreme court has observed that article VI, section 9 of the Tennessee Constitution prohibits judges from commenting upon the credibility of witnesses or otherwise expressing an opinion concerning the weight of the evidence presented during a trial. State v. Suttles, 767 S.W.2d 403, 406 (Tenn. 1989). "[T]rial judges should always use restraint and not interject themselves into a role in a trial which may be perceived as that of an advocate rather than an impartial arbiter." State v. Riels, 216 S.W.3d 737, 747 (Tenn. 2007). "Unless the record shows the trial judge has so far questioned a witness in such a manner to clearly show the accused has been prejudiced, a new trial will not be granted." Hardin, 691 S.W.2d at 581 (citing Pique v. State, 480 S.W.2d 546 (Tenn. Crim. App. 1971)).

Turning to the instant case, we note that prior to both instances of the trial court's questioning the victim, the State asked the victim a couple of confusing questions. In fact, the prosecutor stated at one point that she was confusing herself. We further note that the trial court interrupted the State and questioned the victim while the State was attempting to ask him about testimony that had already been presented during direct

examination and cross-examination. Although the trial court's questioning of the victim regarding Quientel Collins was brief, the trial court questioned the victim more extensively about how he was able to learn the robbers' names. Regardless, the trial court instructed the jury, as requested by the appellant, that neither the State nor the appellant had done anything improper and that the court was only trying to clarify the victim's testimony and expedite the trial. We generally presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Finally, the court did not make any specific comments about the evidence or the victim's credibility, and nothing indicates that the trial court's questioning caused prejudice to the appellant. Accordingly, we conclude that the appellant is not entitled to relief on this issue.

That said, we must address some of the comments made by the trial judge. Explaining that he did not "raise [his] voice[] at lawyers," the judge contrasted his restraint with the lack thereof by other judges, whom he named, saying that he did not "undress lawyers" as they would have done. Referring then to a heavily publicized multiple murder case tried several years earlier, the judge explained that he did not engage in yelling and screaming at lawyers, which the other judge, whom he again identified by name, had done in that case. The judge continued that "had you done to other judges what you did to me yesterday, they would have undressed you, but I don't do that, because I try to treat people courteously."

While it is admirable that the trial court in this matter understands the importance of acting with restraint when he believes that trial counsel has committed a "professional discourtesy" regarding the judge, he should be mindful of the Code of Judicial Conduct. Tennessee Supreme Court Rule 10, Canon 1, Rule 1.2, requires that judges "shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Disparaging other judges to promote oneself does not promote public confidence in the integrity of the judiciary.

### D. Motion to Recuse

In a related argument, the appellant contends that the trial court should have granted his motion to recuse based upon the court's questioning of the victim, the court's "very abrupt and seemingly disgruntled" response to defense counsel's objection to the questioning, and the "contentious" relationship between the court and defense counsel. The State argues that the appellant has waived the issue. We agree with the State.

The record reflects that the appellant filed a motion to recuse on April 17, 2014, almost three months after the jury convicted the appellant and almost two months after

the trial court sentenced him. The trial court found the motion to be untimely. "A motion for recusal should be filed when the facts forming the basis of that motion become known." Bean v. Bailey, 280 S.W.3d 798, 803 (Tenn. 2009) (citing Davis v. Tenn. Dep't of Employment Sec., 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999)). Furthermore, a defendant's failure to file a motion to recuse in a timely manner may result in a waiver of his or her complaint about the judge's impartiality. Id.

Although the appellant complains about the trial court's conduct and demeanor during the trial, he waited until several months after the trial to file his motion. Therefore, we agree that the motion was untimely and that the issue has been waived. See Tenn. R. App. P. 36(a).

E. Prior Bad Acts

The appellant contends that the trial court erred by admitting proof of other bad acts when it allowed the State to play the recording of his jailhouse telephone conversation with his mother and when it allowed Kandace Turley to testify about his and Brown's preparing to commit a robbery. The State argues that the trial court did not admit any evidence of prior bad acts. We conclude that the trial court erred and that we cannot say the error was harmless.

Before trial, the appellant filed a motion in limine to exclude the State's playing for the jury the recorded jailhouse telephone call in which the appellant told his mother, "I admitted to two robberies." At a hearing on the motion, defense counsel argued that the trial court should prohibit the State's introduction of the call because the appellant was being tried for only one robbery. The State advised the court that three hours prior to the appellant's conversation with his mother, he admitted to police that he committed the robbery involving the victim and a second robbery involving two other individuals; therefore, there was "no doubt" that one of the robberies the appellant was referring to in the telephone conversation was that of the victim. The trial court ruled that "[i]t has, in fact, been proven by clear and convincing evidence. This is an admission by the Defendant." The court agreed with the appellant that the jury should not hear him admit to two robberies when he was on trial for one robbery. However, the court held that the appellant's saying he committed a robbery was relevant to this case and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The court ordered that the State prepare a transcript of the recording for the jury in which it substituted the appellant's saying "I admitted to a robbery" for "I admitted to two robberies."

Before opening statements, the trial court noted for the record that the State had been able to alter the recording so that the jury could hear the appellant say "a robbery"

instead of "two robberies." Defense counsel again objected to the State's playing the recording, arguing that this was an issue regarding bad acts governed by Tennessee Rule of Evidence 404(b), not an issue of relevance governed by Rule 403. Defense counsel requested that the trial court determine whether the appellant's statement was admissible under Rule 404(b), and the trial court stated as follows:

> This is not a 404(b) issue. This is an admission made by your client, allegedly, <u>in which he admitted that he has committed the crime for which he is on trial</u>. This is not other conduct. This is not other wrongs or acts or wrongdoing. This is not a 404(b) issue.
>
> The State of Tennessee is not asking to bring in proof of other extraneous offenses that may have been committed by your client to show a pattern or anything else that a 404(b) would allow if it is other conduct. And 404(b) goes to other crimes, other wrongs, other acts. And this is not other crimes, acts, or wrongs; that is, "I am having to do some time for this robbery because I did it."

(Emphasis added.)

Defense counsel argued that the State had failed to present any evidence that the appellant was admitting to the crime at issue and asked if the trial court was "finding . . . as a matter of fact . . . that, indeed, that call . . . is specifically directed toward the robbery of Jarvis Robinson." The trial court responded,

> [T]hese are factual issues. I don't determine the facts. There's a legal question that is before me as to whether or not the tape is, in fact, admissible. I've ruled that the tape is admissible. Factual issues are determined by a jury.
>
> . . . .
>
> So, no, I'm not making a factual determination. I can't make factual determinations. But a legal determination, I made a legal determination, and the jury can give any evidence whatever weight they choose to give it. Admissible, yes, it is legally admissible. Factually, whatever weight the jury wants to give it, that's a -- that's a factual issue that's reserved for the trier of fact.

Shortly after the trial court's ruling, defense counsel also objected to Kandace Turley's proposed testimony regarding the appellant and Brown being at her apartment about one week before Brown's arrest. As with the jailhouse recording, defense counsel argued that Turley's testimony was prohibited by Tennessee Rule of Evidence 404(b) because it related to another crime, not the robbery and shooting of the victim. The State advised the court that Turley was going to testify that the incident at her apartment occurred about one week before Brown's October 11, 2010 arrest. The State argued that "[u]nless I don't understand my math, that makes it October the 4th of 2010" and that the incident at Turley's apartment was "absolutely dealing with this case, it's dealing with no other case." The trial court ruled that Turley's testimony was "a fact question" and that "if the jury wants to believe it has nothing to do with this robbery, that's up to the jury. If the jury wants to believe that she's totally mistaken, that's up to the jury. Those are factual issues which I do not rule on."

Kandace Turley testified as the State's first witness that about one week before Brown was arrested in this case, the appellant arrived at her apartment. About thirty mintues later, the appellant and Brown emerged from the back bedroom, and the appellant told Turley that they were going to "go hit a lick," meaning commit a robbery. The appellant, who had a handgun, put a t-shirt over his head, and Brown, who had a large gun the size of a shotgun, wrapped a hoodie around his head. Turley said it was still daylight when the two men left her apartment.

At that point, defense counsel objected, asked to approach the bench, and stated as follows:

> Your Honor, just briefly, this is why I wanted to have a jury-out hearing with this witness. She's now testified that the alleged incident that she's now talking about occurred when it was getting dark, and I think that goes to whether or not she's talking about something else or not. And I think that goes under [the] clear and convincing aspect. Are we talking about another crime, robbery, act? It's clear that the record in this case reflects that this occurred at nine, approximately 9:00. This is October. It's clear that, you know, this could be a totally, entirely separate incident, so that they go right back where we indicated, and I just wanted to make a record of that.

The trial court overruled the objection, stating, "[A]gain, these are factual issues. The testimony is admissible, and the weight is a fact question for the jury."

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

> The determination of whether proffered evidence is relevant in accordance with Tenn. R. Evid. 402 is left to the discretion of the trial judge, State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995), as is the determination pursuant to Rule 403, Tenn. R. Evid., of whether the probative value of evidence is substantially outweighed by the possibility of prejudice. State v. Burlison, 868 S.W.2d 713, 720-721 (Tenn. Crim. App. 1993). See also State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. Williamson, 919 S.W.2d at 78.

State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999)

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

(1) The court upon request must hold a hearing outside

- 31 -

the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

As to the recorded call, the trial court ruled that it was relevant to the robbery of the victim and that 404(b) was not implicated because the State was not offering other bad act evidence. However, we are puzzled as to how the court could determine that the appellant was admitting to robbing the victim without hearing proof on the issue. The State advised the court that the appellant had admitted to two robberies, one of which was the robbery of the victim, just three hours before his conversation with his mother, but called no witnesses to testify to that evidence. Thus, the appellant had no opportunity to challenge the State's claim that the appellant was admitting to robbing the victim. Therefore, we conclude that the trial court erred.

As to Turley's testimony, the trial court should have heard Turley testify outside the presence of the jury and should have determined whether the incident at her apartment was part of the robbery and shooting of the victim. If the court had ruled that the incident was the precursor to the crime at issue and admissible pursuant to Tennessee Rules of Evidence 401, 402, and 403, then no 404(b) hearing was necessary. However, if the court had found that the incident was not related to the robbery of the victim but to some other robbery, then a 404(b) hearing would have been needed to dermine the admissiblity of Turley's testimony.

Next, we must determine the effect of the errors, specifically whether they "'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (quoting Tenn. R.

App. P. 36(b)). The victim's testimony that he recognized the appellant during the robbery and the appellant's admitting to the robbery were strong evidence of his guilt. However, Sergeant Pruitt testified during a suppression hearing that the appellant "was responsible for several robberies." Therefore, it was crucial for the trial court to determine properly whether the jailhouse call and Turley's testimony related to the victim's robbery or a different robbery so that the court could then conduct the proper 404(b) analysis if necessary. We note that Turley's testimony that the victim was wearing a t-shirt over his head, that Brown was wearing a hoodie over his head, and that the men left her apartment while it was still light outside conflicted with the victim's testimony that the robbers were wearing ski masks and approached him while it was dark and seriously calls into question whether the two incidents were related. In other words, the jury likely heard propensity evidence without the trial court's conducting the proper 404(b) analysis. Therefore, we cannot say that the trial court's error was harmless and conclude that the appellant is entitled to a new trial.

## F. Statement by Co-defendant Brown

The appellant contends that the trial court erred by ruling that Sergeant Pruitt could testify about a statement made by co-defendant Brown, implicating the appellant. The State argues that the appellant has waived the issue for failing to raise it in his motion for new trial. We agree that the issue has been waived. See Tenn. R. App. P. 3(e).

## G. Prosecutorial Misconduct

The appellant claims that the State committed prosecutorial misconduct during closing arguments. The State argues that the appellant is not entitled to relief because the trial court gave a curative instruction that addressed the appellant's concerns, nothing indicates that the prosecutor's comments prejudiced the jury, and the State's case was "overwhelmingly strong." We agree with the State that the appellant is not entitled to relief on this issue.

The appellant complains that the State committed prosecutorial misconduct when the prosecutor stated during her closing argument:

> And then you get to decide, . . . was [the victim] testifying willfully falsely, or was he mistaken? And so look at your instructions on prior inconsistent statements impeachment, look at your instructions on credibility, and then lay them out. Do they matter? Are they important? And was he honestly mistaken, or was he willfully testifying

falsely? And I submit, ladies and gentlemen, from what you saw of Jarvis Robinson, God bless him, he's not the smartest tool in the toolbox, but you saw him honestly try to answer every single question the best he could. And I submit, he's not capable of willful deceit.

Defense counsel objected, and the trial court instructed the jury as follows:

[L]awyers cannot vouch for the credibility of witnesses. They can't tell you that they think somebody has been honest. They can tell you that based on the proof, that it is your determination to make a decision as to whether or not a person has been honest.

So [the prosecutor] is not -- and she cannot vouch for whether or not Mr. Robinson or any other witness has been truthful. What she's telling you is that -- and I will let her tell you what she's telling you, but lawyers can't tell you, "I think the person has been truthful," "I think the person has been untruthful." That is really one hundred percent (100%) within your province as to whether or not you think a person has been truthful.

The prosecutor then continued with her argument, stating, "And it's absolutely up to you, and I'm asking you to use your common sense and reason based on what you see. I submit simply that when you do that, that will be what you find."

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the

record that are not matters of common public knowledge. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

"(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]

(2) the curative measures undertaken by the court and the prosecution[;]

(3) the intent of the prosecutor in making the statement[;]

(4) the cumulative effect of the improper conduct and any other errors in the record[; and]

(5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). We note that "the Judge factors should only be applied to claims of improper prosecutorial argument," as in this case, not claims of unconstitutional prosecutorial comment. State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014). "[T]he State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper." Id.

We agree with the appellant that the prosecutor was attempting to vouch for the victim's credibility. However, her improper argument was brief. Moreover, the trial court gave a lengthy instruction that the jurors, not the attorneys, determined the credibility of the witnesses. As stated previously, we generally presume that a jury has followed the trial court's instructions. See Butler, 880 S.W.2d at 399. Therefore, we conclude that the appellant is not entitled to relief.

## H. Cumulative Error

Finally, the appellant contends that the combination of errors committed during his trial denied him a fair trial. We have carefully reviewed the record and have concluded that the trial court erred by properly failing to determine whether the appellant's statement to his mother and Kandace Turley's testimony related to the robbery of the victim or constituted evidence of other bad acts and by failing to conduct Tennessee Rule

of Evidence 404(b) analysis if necessary. However, we have remedied those errors by reversing the appellant's conviction and remanding the case to the trial court for a new trial. We find no cumulative error warranting further relief.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the appellant's conviction must be reversed and the case remanded for a new trial. We also conclude that on remand, the case shall be assigned to a different judge.

_____
NORMA MCGEE OGLE, JUDGE